UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KEVIN BOND,

        Petitioner,

                                    CASE NO. 2:08-CV-13253

      v.                           HONORABLE MARIANNE O. BATTANI
                                    MAGISTRATE JUDGE PAUL J. KOMIVES

LLOYD RAPELJE,

        Respondent.
_____/


**<u>REPORT AND RECOMMENDATION</u>**

*Table of Contents*

I.     **<u>RECOMMENDATION</u>**..............................................................................................2

II.    **<u>REPORT</u>**...............................................................................................................2

    A.    *Procedural History*................................................................................2
    B.    *Factual Background Underlying Petitioner's Conviction*........................4
    C.    *Standard of Review*...............................................................................8
    D.    *Sufficiency of the Evidence (Ground 1)*...............................................10
        1.    Clearly Established Law..............................................................10
        2.    Analysis.....................................................................................12
    E.    *Prosecutorial Misconduct (Ground 2)*.................................................15
        1.    Clearly Established Law..............................................................15
        2.    Analysis.....................................................................................16
            a.    Gang Evidence.................................................................16
            b.    Mention of Alibi...............................................................16
            c.    Comment on Silence.........................................................17
    F.    Ineffective Assistance of Counsel (Ground 3).......................................19
        1.    Clearly Established Law..............................................................19
        2.    Analysis.....................................................................................20
    G.    Cumulative Effect of Errors...................................................................21
    H.    *Recommendation Regarding Certificate of Appealability*......................22
        1.    Legal Standard...........................................................................22
        2.    Analysis.....................................................................................24
    I.    *Conclusion*.........................................................................................24

III.   **<u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>**...............................................25

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the court should also deny a certificate of appealability.

II.     REPORT:

A.      *Procedural History*

1.      Petitioner Kevin Bond is a state prisoner, currently confined at the Saginaw Correctional Facility in Freeland, Michigan.

2.      On November 2, 2005, petitioner was convicted of first degree premeditated murder, MICH. COMP. LAWS § 750.316(1)(a), conspiracy to commit first-degree premeditated murder, MICH. COMP. LAWS § 750.316(1)(a) and 750.157a, four counts of assault with intent to commit murder, MICH. COMP. LAWS § 750.83, carrying a concealed weapon, MICH. COMP. LAWS § 750.227, felon in possession of a firearm, MICH. COMP. LAWS § 750.224f, and two counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Saginaw County Circuit Court.  On December 8, 2005, he was sentenced to two terms of mandatory life without possibility of parole on the murder and conspiracy conviction, four terms of 22-50 years on the assault convictions, two terms of 3-7 ½ years on the concealed weapon and felon in possession conviction, and two terms of mandatory consecutive 2 years' imprisonment on the possession of a firearm during commission of a felony conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

        I.      THE TRIAL COURT VIOLATED MR. BOND'S DUE PROCESS

> RIGHTS BY ALLOWING THE PROSECUTOR TO INTRODUCE THE VIDEOTAPE OF DILANJAN MILLER'S STATEMENT, WHICH WAS NOT PROVIDED TO MR. BOND DURING DISCOVERY.
>
> II.    THE EVIDENCE WAS INSUFFICIENT TO CONVICT MR. BOND OF FIRST DEGREE PREMEDITATED MURDER.
>
> III.    MR. BOND WAS DENIED A FAIR TRIAL WHEN THE PROSECUTION COMMITTED PROSECUTORIAL MISCONDUCT BY ELICTIING UNFAIRLY PREJUDICIAL AND INADMISSIBLE TESTIMONY IN VIOLATION OF THE TRIAL COURT'S RULING.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Bond*, No. 270091, 2007 WL 4208971 (Mich. Ct. App. Nov. 29, 2007) (per curiam).

4.    Petitioner, proceeding *pro se*, sought leave to appeal these three issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Bond*, 480 Mich. 1138, 746 N.W.2d 69 (2008).

5.    Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on July 29, 2008. As grounds for the writ of habeas corpus, he raises the following claims:

> I.    PETITIONER WAS DENIED HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS WHERE HE WAS FOUND GUILTY BASED ON INSUFFICIENT EVIDENCE
>
> II.    PETITIONER WAS DENIED HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS OF DUE PROECESS WHEN THE TRIAL WAS PERVADED WITH PROSECUTORIAL MISCONDUCT
>
> III.    PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHERE PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL
>
> IV.    THE CUMULATIVE EFFECT OF PROSECUTORIAL MISCONDUCT COMBINED WITH COUNSEL'S DEFICIENT PERFORMANCE, RESULTED IN PREJUDICE AND DEPRIVED KEVIN BOND OF HIS

CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS

6.      Respondent filed his answer on February 6, 2009.  He contends that petitioner's claims

are without merit and opposes the request for habeas relief.

B.      *Factual Background Underlying Petitioner's Conviction*

        The evidence adduced at trial was accurately summarized in the prosecutor's brief in the

Michigan Court of Appeals:

> On September 28, 2004, Defendant was charged with 10 felonies, including the first-degree premeditated murder of Nicholas Green. The charges against Defendant arose from Defendant's involvement in a July 19, 2004, drive-by shooting on the north side of the City of Saginaw. The shooting occurred in retaliation for the July 18th murder of Defendant's best friend, a young man from the east-side of the city. Defendant's jury trial took place in October of 2005. Defendant was tried separately from Co-defendants Marcus Clemmons, Tommy Keels, and Andre McKnight. In October 2004, before trial, two witnesses— Dilanjan Miller and Trudell Feagin—were provided immunity in exchange for their testimony. (Information; Reg; Trial Transcript (TT) I-V; Exs 66, 67)

> During Defendant's trial, the People presented 18 witnesses and introduced over 75 exhibits, including photographs of the crime scene and the vehicles involved, as well as other evidence collected at the scene. (TT II-IV)

> On the first day of trial, the prosecutor and defense counsel noted that references to gangs or gang activity could come up as they had in a previous trial [for a co-defendant]. (TT I, 7, 10) The prosecutor also noted that using the word gang or that type of terminology would be supported by the evidence, but that he would not exaggerate or draw that out. The court recalled that references had been made in the other trial to the fact that the group of people in the van belonged to some east-side group and one of their members had been killed. He indicated that evidence would also be allowed in this trial. The prosecutor then explained he didn't intend to use the [gang] terminology to excess, "but it could come up." The judge responded by stating, "Tell your witnesses not to use it. Okay." (TT I, 7-8)

> Also during trial, the court, over defense objection, allowed the prosecutor to introduce and play a videotape of witness Dilanjan Miller's September 22, 2004, statement to the police, pursuant to MRE 801(d)(1)(B) – a statement given

4

prior to the grant of immunity. And at the defense request, a transcribed copy of the video statement was also provided to jurors. (TT II, 125-131, 137-138; Exs 66, 75-76)

Trial evidence included the facts noted below.

On July 18, 2004, Omar McKnight, a young man from Saginaw's east-side, was shot and killed. (TT II, 66-67, 70-74; TT III, 95-96) News of the McKnight murder spread quickly among his friends and family. The next day a group gathered at the home of McKnight's mother. (TT II, 73-74, 80-84; TT III, 20-22, 92-93; Exs 75-76) The grieving group included the Defendant, who considered Omar McKnight his best friend. (TT II, 80-84, TT III, 20-22; TT IV, 60-67)

McKnight's friend, Tommy Keels, managed to obtain the use of a 1985 Chevy van on July 19th, the day after McKnight was murdered. (TT III, 7-13, 75-78) On that same date, a group of five young men, including Nicholas Green, were on Norman Street on Saginaw's north-side. This group was working on a car that wouldn't start. They had the hood of the car up and another car facing it as they were attaching jumper cables. (TT II, 45-49, 57-58, 139-141; TT III, 52-53, 63)

As it became dark on the 19th, McKnight's east-side friends (Defendant, Keels, McKnight's brother, Dilanjan Miller, Tradell Feagin, and Marcus Clemmen) began riding around in the van and smoking marijuana. (TT II, 75-80, 84; TT III, 24, 96-98; Exs 75-76) Several members of this east-side group, including Defendant, who had a gun in his lap, indicated they would ride around the north-side and start shooting if they saw someone – because they killed Omar. (TT II, 70-72, 84-86, 105; TT III, 17-20, 46-48; Exs 75-76) Defendant's gun was small – like a ".22" (TT II, 107-108; Exs 75-76) As they went down Norman Street on the north-side, they saw the group of men attempting to jump start a car. (TT II, 58, 87-88; Exs 75-76) Defendant exclaimed that Antoine Jones was in the group working on the car and the van driver, Feagin, turned the van around. (TT II, 88-89; TT III, 24-25, 26-29; Exs 75-76) Defendant said, "we fixing to get 'em"…. "go get them n------". Again, statements were made that Omar just got killed. Dilanjan Miller was told to lay down out of the way. (TT II, 86-90; Exs 75-76) As the van slowed to a quick stop, Miller saw Tommy Keels with a gun in his hand shooting towards the cars, while Defendant was shooting over him out the window toward the group of men by the cars. Defendant continued shooting out the back, at the group near the cars, as the van sped away from the scene. (TT II, 90-93, 104, 121; TT III, 29; Exs 75-76) Feagin, the driver, did not see whether Defendant, who was behind him, was shooting but did see Clemons seated next to him with a gun. (TT III, 34-38)

The group of young men working on the cars were caught in the barrage of gunfire from the van and panicked as numerous shots—"probably 30 to 40" in all—rang out at them. (TT II, 50-54, 142-144; TT III, 55-57; TT IV, 11-12) Nicholas Green was hit by the shots and fell at the curb with blood gushing from his stomach. (TT II, 50-51; TT III, 57; TT IV, 10-11, 24) Green was eventually transported to the hospital, but died from internal bleeding where the bullet penetrated his liver, lungs, and aorta. The examining pathologist recovered the large-caliber bullet causing those injuries and turned it over to investigators. (TT III, 114-118) Terrance Jones and Jamal Young, who were in the group by the cars, were also injured by the gunfire. (TT II 142-146, TT III, 66)

After the shooting, Miller was dropped off and told that he better not say anything. (TT II, 93-96, 100, 114; Exs 75-76) The rest of the group rode in the shot-up van to an apartment house, where they parked the van and left it. (TT III, 30-33, 690-71, 78-82; Exs 32-35)

Raheem Nash, who grew up on the east-side of Saginaw, explained the animosity between groups or gangs on the east-side and north-side, as did a number of other witnesses. (TT II, 67; TT III, 96-97, 123-127) Nash heard about the murder of Omar McKnight within an hour after it occurred. He noted that "people were pissed" and that when Defendant was present, JR (Tommy Keels) stated, "somebody got to die, somebody got to go …" (TT III, 93-95, 105) Nash, who had been riding with the group in the van, but was dropped off before the shooting, observed two guns in the van—possessed by Marcus Clemmons and Tommy Keels. He thought one was a .40 caliber and one a 9 millimeter (TT III, 98-100, 110-111)

Police investigation at the crime scene revealed numerous casings around the two cars where the shooting occurred. (TT III, 125-128: 146-160; TT IV, 40; Exs 12-27) Analysis of the fired cartridge casings from the shooting scene revealed that there were several different types present: .40 caliber Smith & Wesson, .22 and a type characteristic of a .38, 9-millimeter or, 380 caliber class fired bullet. (TT III, 150-160; Exs 57, 58)

The Chevy van used by Defendant and his companions was also inspected by the police, who recovered a number of cartridge cases from inside the van. (TT III, 162-165; TT IV, 40, 49-52; Exs 35-52) Damage and bullet holes in the van were consistent with shots being fired from inside the van. (TT III, 178-188)

A total of 35 fired-cartridge cases were recovered from the interior of the van and from the shooting scene (street area and cars). (TT III, 167, 190-196) The fired casings from inside the van included .22 caliber casings near the rear, 9-millimeter casings near the middle, and .40 caliber Smith and Wesson casings

near the from passenger seat. (TT III, 162-164, 200-2001; Exs 57-58) Firearms expert Ryan Larrison explained that laboratory analysis revealed all 12 of the fired .40 Smith & Wesson caliber cartridge cases from the shooting scene, and three from inside the van, were fired by the same Glock firearm. (TT III, 162-164; Exs 57-58) The .9 millimeter casings were also all identified as having been fired from the same 9-millimeter firearm. Similarly, the .22 casings were identified as having been fired from the same firearm. And the .380 automatic caliber cartridge cases were all identified as having been fired by the same firearm. (TT III, 164-167; Exs 57-58) Analysis of the various fired casings thus indicated four guns were used in the shooting—a 380 caliber, a 9-millimeter, a .40 caliber, and a .22 caliber. (TT III, 1999)

Appellee's Br. on Appeal, in People v. Bond, No. 270091 (Mich. Ct. App.), at 1-6

When Petitioner filed a Supplemental Brief to the Michigan Court of Appeals, the prosecution responded to that brief and in their response added the following additional facts:

-Detective Paetz first encountered Defendant, in relation to a search warrant executed at Tommy Keel's apartment, the day after the shooting—Defendant was pointed out as someone who may know Keel's whereabouts, Defendant not in custody or under arrest at that time was rather uncooperative and [claimed] to have been with grandma all night (TT IV, 64-68, 88-90, 109-110, 114, 118, 120);

-Defendant testified at trial, as his counsel in his opening statement indicated he would (TT II, 39; TT IV, 74-123);

-Defendant's position at trial was that he was in the van from which shots were fired on the date in issue, but he did [not] shoot a gun, did not possess a gun at that time and did not engage in talk about going to shoot someone (TT II, 39; TT IV, 76-87);

-Defendant testified at trial that he wanted to cooperate with the detective and began talking to her again at the jail after his arrest, but then said he would only talk to her if his lawyer was present (TT IV, 111-113, 118-121);

-Defendant also admitted he was claiming alibi and had been with Darlene Trader on the date in issue (TT IV, 114-118);

-[Detective] Paetz, in rebuttal to Defendant's testimony, explained that her second contact with Defendant was after he reported to probation, was arrested on a bench warrant and put in jail and Defendant signed a waiver of rights form indicating he was willing to talk, but when the detectives indicated they wanted to

talk about the murder of Nicholas Green, Defendant stopped and said he did not want to talk and he became "quite belligerent" (TT IV, 124-129).

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1)

permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the

requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Sufficiency of the Evidence (Ground I)*

        1.      *Clearly Established Law*

        The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F. 3d 645, 650 (6th Cir. 1993).

        However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeal's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom.*

*Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, see *Jackson*, 443 U.S. at 323, "[t]he applicability of the reasonable doubt standard…has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also, Jackson*, 443 U.S. at 324; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment. *See* MICH.COMP.LAWS § 750.317. To establish second degree murder, the prosecution must show malice aforethought, i.e., the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980). Certain additional elements elevate second degree murder to first degree murder, which is punishable by a mandatory term of nonparoleable life imprisonment. These include murder done with premeditation or committed in the course of certain enumerated felonies. *See* MICH.COMP.LAWS § 750.316(1)(a), (b).

To establish first degree premeditated murder, the prosecution must prove the elements of

second degree murder, plus the additional element of premeditation. "In order to convict a defendant of first-degree murder, the prosecution must prove that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate." *People v. Anderson*, 209 Mich. App. 527, 537, 531 N.W.2d 780, 786 (1995); *see also, Grant v. Rivers*, 920 F. Supp. 769, 786 (E.D. Mich. 1996); *People v. Younger*, 380 Mich. 678, 681, 158 N.W.2d 493, 495 (1968); *People v. Brown*, 137 Mich. App. 396, 407, 358 N.W.2d 592, 597 (1984). Under Michigan law, "premeditation is measured in time; time to permit a reasonable person to subject the nature of his response to a second look." *Brown*, 137 Mich. App. at 407, 358 N.W.2d at 597. "The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing." *Anderson*, 209 Mich. App. at 537, 531 N.W.2d at 786. Relevant factors include the relationship of the parties, the defendant's actions prior to the killing, the circumstances of the killing, and the defendant's conduct after the killing. *See id.*; *Brown*, 137 Mich. App. at 407, 358 N.W.2d at 597. Further, because first degree murder requires premeditation and deliberation rather than simply malice aforethought (as is required for second degree murder), the actor must have the specific intent to kill in order to be convicted of first degree murder. *See People v. Hart*, 437 Mich. 898, 898, 465 N.W.2d 328, 328 (1991); *People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 715 n.102, 299 N.W.2d 304, 320 n. 120 (1980).

2.     *Analysis*

Petitioner's claim that there was insufficient evidence to find him guilty of every element of the crime does not meet the appropriate standard of review. As noted above, under *Jackson* the appropriate question is whether, based on the evidence, any rational trier of fact could have

found the defendant guilty. The court of appeals's decision to uphold the verdict was consistent with this standard. Since the *Jackson* standard is the relevant clearly established federal law, the court's actions were not contrary to or an unreasonable application of clearly established law.

Based on the totality of evidence presented at trial, it is clear that a reasonable trier of fact could have found the defendant guilty of first degree murder. This requires that petitioner actually committed the murder and that he did it with premeditation and deliberation. For the first element, the evidence presented by the prosecution indicated that petitioner was at the scene of the crime when it occurred. He was in the van used to commit the crime and had a gun in his possession during this time. The gun in petitioner's possession was consistent with the type of shell casings found at the crime scene and the van. Eyewitnesses testified that petitioner had in fact fired at the group of men which included the victim. There was also evidence presented as to the motive for the shooting. Omar McKnight, petitioner's best friend, was killed one day before the shooting. The death of Omar was attributed to a north side group which is where the crime in question took place. Based on this evidence a trier of fact could have found the first element to be present.

The second element required for first degree murder includes premeditation and deliberation. This element was met by the evidence presented at trial. The court of appeals addressed this issue in its ruling and conclusively found that a reasonable trier of fact could have found the petitioner guilty. The court noted that premeditation may be established by "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *People v. Bond*, No. 270091, 2007 WL 4208971, at *2 (Mich. Ct. App. Nov. 29, 2007) (internal citations

omitted). The prosecution presented the fact of petitioner's best friend's murder as motive for the shooting. This murder occurred one day prior to the shooting and was attributed to the actions of a north side group. Petitioner entered into a van with Omar's brother and various other men and they drove around the north side of the city looking for individuals. The court of appeals mentioned that "the six men in the van stopped and visited Omar McKnight's grieving family". *Id* at *3. There was also eyewitness testimony that petitioner stated, "if we see anybody, we [are] going to shoot them because they killed Omar." *Id* at *3 (internal citation omitted). In light of this and taking into account the entirety of the evidence presented, it is clear that the *Jackson* standard was met and that the court of appeals reasonably applied this standard.

Petitioner's argument that this evidence was not sufficient because the witnesses were not credible is without merit. A reviewing court may not interfere with the jury's role of "determining the weight of the evidence or the credibility of witnesses." *People v. Stiller*, 242 Mich. App. 38, 42, 617 N.W.2d 697,699 (2000). It is the trier of fact who determines the credibility of the witnesses and whether or not they have ulterior motives for giving their testimony. Petitioner also argues that there was conflicting testimony presented at the trial and that a conviction based on this conflicting evidence is not sufficient. However, it is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326; *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996). Again, the correct standard here is whether or not the court of appeals's decision to uphold the original conviction was a reasonable application of clearly established federal law. Looking at the totality of the evidence presented, the court of appeals's decision was a reasonable application of *Jackson*.

Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his sufficiency of the evidence claim.

E.     *Prosecutorial Misconduct (Ground II)*

Petitioner refers to a number of incidents that he claims amount to prosecutorial misconduct. Specifically, petitioner contends that the prosecutor: violated a court order by eliciting testimony which introduced the term "gang" into the trial; violated his Fifth Amendment right to remain silent by introducing alibi evidence when the defense had not asserted one; and violated his Fifth Amendment right against self incrimination by eliciting testimony regarding petitioner's silence before and after he was arrested.

1.     *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (internal quotation omitted). "[T]he touchstone of due process analysis…is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Prichett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct

must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

2. *Analysis*

### a. Gang Evidence

There is no need to delve deeply into the merits of the claim related to the mention of the word "gang" because petitioner's argument relies on the intention of the prosecutor being malicious. This argument is without merit because "[t]he touchstone of due process analysis…is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In terms of fairness, the issue dealing with the introduction of the word "gang" into the proceedings is fairly straightforward. While it is true that the trial judge instructed the prosecutor not to mention the word "gang", he did not preclude any mention of the rivalries and other circumstances related to gang activity. The only thing precluded was the use of the actual word and the jury could very easily have inferred that the prosecutor was discussing gangs when he mentioned rival groups and territorial disputes. Therefore, an instance where the word "gang" was used would not create unfairness. Also, as the court of appeals mentioned, this was a singular reference by a witness being nonresponsive rather than an intentional reference by the prosecutor.

### b. Mention of Alibi

Next, petitioner claims his due process rights were violated by the mention of an alibi that he had no intention of bringing up as a defense. Petitioner argued that this comment violated his right to remain silent. Although such a violation may occur when the prosecutor comments on the failure of a defendant to bring alibi evidence when he has filed notice of an alibi defense,

*People v. Hunter*, 95 Mich. App. 734, 738-739, 291 N.W.2d 186, 188 (1980), that is not what occurred in this case. The prosecutor did not comment on the lack of evidence that petitioner had presented in support of his "alibi". Rather, the prosecutor was bringing up contradictions in petitioner's story. Petitioner had initially stated that he was with his grandmother all day but later changed his story and admitted he was in the van at the time of the shooting. The issue of where petitioner was during the time of the shooting was not in question during the trial. There was no alibi defense being presented, nor was there any notice of the intent to bring one. Hence, the prosecutor's remarks were not made with the intent to show petitioner had not met a certain burden when he did not, in fact, have one. When taken into context, the comments concerning the initial alibi given to the police were made by the prosecutor to address the credibility of petitioner and thus did not deprive petitioner of a fair trial.

### c. Comment on Silence

Petitioner next claims that his due process rights were violated due to the prosecutor's questions which intentionally brought petitioner's pre-*Miranda* silence into evidence. This claim is also without merit. The Supreme Court has held that the provision against self-incrimination in the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965). Likewise, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle v. Ohia*, 426 U.S. 610, 618 (1976). However, the Court's subsequent cases have made clear that *Griffin* and *Doyle* are limited to situations in which the defendant's silence was induced by the governmental assurances embodied in the *Miranda* warnings. *See Fletcher v.*

*Weir*, 455 U.S. 603, 606 (1982). Since the issue in this case concerns petitioner's silence before he was arrested and before he was read his *Miranda* rights, that silence could not have been induced by assurances in the later given *Miranda* warnings. The Supreme Court has never held that the use as substantive evidence of a defendant's pre-arrest silence not induced by *Miranda* warnings violates the Fifth Amendment. On the contrary, the Court in *Jenkins* explicitly declined to "consider whether or not under what circumstances pre-arrest silence may be protected by the Fifth Amendment." *Jenkins v. Anderson*, 447 U.S. 231, 236 (1980); *see also*, *Portuondo v. Agard*, 529 U.S. 61, 70 (2000) (noting *Jenkins* Court's observation that "it was not clear whether the Fifth Amendment protects pre-arrest silence.").Therefore bringing up that silence during trial did not violate clearly established federal law.

The further claim that these same rights were violated because of the admittance of his post-*Miranda* silence into the record, while ultimately rejected, deserves more attention. The court of appeals correctly analyzed the claim and dismissed it. In terms of a defendant's post-*Miranda* silence, the use of that silence at trial is prohibited by the Due Process Clause of the Fourteenth Amendment. *Doyle v. Ohio*, 426 US 610 (1976). However, when the defendant brings evidence or falsely represents himself as being cooperative with law enforcement then he opens the door to the full exploration of that issue. In such a "situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest." *Id*. at 619, n.11. The court of appeals correctly noted the "defendant testified that he turned himself in and talked with the police as soon as he heard from his grandmother that the police wanted to speak with him. Thus, he opened the door to the prosecution's calling a police witness to rebut his inference of cooperation." *Bond*, 2007

WL 4208971, at *6, slip op. at 7. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Ineffective Assistance of Counsel (Ground III)*

1.    *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *See id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim…to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice,…that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (internal citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the

19

evidence before the fact finder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2.     *Analysis*

Petitioner first asserts that his counsel was ineffective due to a lack of preparation for the trial. He bolsters this argument by pointing to counsel's lack of knowledge of the murder of one of the prosecution's witnesses, Larry Darden, and the incarceration of two other prosecution witnesses, Terrance Jones and Dantae Bell. To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. Further, "[t]here is no reason for a court deciding an ineffective assistance claim…to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. With regard to Larry Darden, counsel's lack of awareness concerning Darden's murder is not indicative of a lack of preparation.  Darden's testimony had already been presented in court before he was murdered and it is unrealistic to require an attorney to monitor the status of witnesses, especially the opposing party's witnesses, once their role in the trial is over.  Additionally, because Darden's testimony was already part of the record and his murder was not related to petitioner's case, it is clear that counsel's lack of knowledge did not prejudice petitioner. With regard to Terrance Jones and Dontae Bell, petitioner claims that counsel's lack of knowledge of their status indicated a failure to properly interview the witnesses.  However, both witnesses presented testimony during the trial and both were effectively cross examined by petitioner's counsel, showing that counsel was sufficiently prepared. It is also unclear how counsel's alleged lack of

knowledge as to the incarceration of these two witnesses may have prejudiced the defense. These claims fail to satisfy either of the two criteria necessary to prove ineffective assistance of counsel.

Petitioner also claims his counsel was ineffective by not presenting an adequate defense. However, the court of appeals found that defense counsel did present a viable defense based on the defendant's own testimony that he was present in the car but did not take part in the shooting. *See Bond*, 2007 WL 4208971, at *8, slip op. at 10. A viable defense is all that is required. The court of appeals correctly decided the matter by stating that just because a "defense failed does not mean it was not viable." *Id*. at *8. Therefore, this claim also fails.

Next, petitioner alleges that his counsel effectively prevented the jury from considering the lesser charge of second degree murder. This claim is based on a misrepresentation of the events that transpired during the trial. While it is true that defense counsel told the jury that he agreed with the prosecution that this was not a case of second degree murder, petitioner fails to mention that his counsel also stated "it wasn't first-degree murder, either." Counsel's statements weren't meant to preclude the consideration of second-degree murder as a viable alternative to first degree. Rather, they were a reaffirmation of defense counsel's strong belief in his client's complete innocence. The case petitioner relies on, *Keeble v. United States*, does not apply as it dealt with a situation where the jury was not instructed on the lesser charge. *Keeble v. United States*, 412 U.S. 205 (1973). In petitioner's case, the jury was instructed as to the lesser charge and defense counsel's remarks did not prevent them from considering it. This argument, and the arguments previously mentioned, fail to demonstrate ineffective assistance of counsel. Therefore, petitioner is not entitled to habeas relief on these claims.

G.     *Cumulative Effect of Errors*

Petitioner next contends that he was denied a fair trial by the cumulative effect of the errors at his trial. The Court should conclude that petitioner is not entitled to habeas relief on this basis It is true that "[e]rrors which standing alone may be deemed harmless or insufficiently prejudicial to amount to a denial of due process may cumulatively produce a trial setting which is fundamentally unfair." *Payne v. Janasz*, 71 F.2d 1305, 1316 (6th Cir. 1983) (Jone, J., dissenting); *accord Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983). This rule, however, applies only to constitutional errors; the accumulation of non-errors cannot collectively amount to a violation of due process. *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999); *McKinnon v. Ohio*, NO. 94-4256, 1995 WL 570918, at *12 (6th Cir. Sept. 27, 1995); *Fero v. Kerby*, 39 F.3d 1462, 1475 (10th Cir. 1994). As noted and discussed in this Report, none of petitioner's claims establish constitutional error, and thus his cumulative error argument fails.

H.     *Recommendation Regarding Certificate of Appealability*

1.     *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general

showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." Fed. R. App. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11

requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.      *Analysis*

Before issuing a certificate of appealability, the court must conclude that petitioner has made a substantial showing as to a denial of a constitutional right. The four claims put forward by petitioner  in this case fail to demonstrate this. With regard to the first claim, insufficiency of the evidence, there was an eye witness who testified that petitioner fired into the group of men which included the murder victim. The issues argued by petitioner to support his claim are all questions relating to the credibility and consistency of witness testimony which was for the jury to consider. There was more than enough evidence for a reasonable jury to have found him guilty of first-degree murder. As to the second claim, prosecutorial misconduct, these allegations are all addressed in this report and found to lack merit. The mention of the word "gang", use of petitioner's pre- and post-*Miranda* silence, and testimony regarding an alibi did not constitute prosecutorial misconduct. The resolution of petitioner's ineffective assistance of counsel claim is likewise not reasonably debatable for the reasons explained above. The remaining claim of cumulative effect of errors is also insubstantial. Because only actual constitutional errors may be accumulated, and because there were no such errors, there was no cumulative effect that could have resulted in something less than a fair trial. These are issues whose resolution by this court is not debatable among reasonable jurists. Accordingly, petitioner is not entitled to a certificate of appealability.

I.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III. <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated:6/25/10

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and  by electronic means or U.S. Mail on June 25, 2010.

s/Eddrey Butts
Case Manager