UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KEVIN BOND,

        Petitioner,

v.                                      Case No. 08-13253

LLOYD RAPELJE,                   HON. MARIANNE O. BATTANI

        Respondent.

_____/

### OPINION AND ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DENYING THE PETITION FOR THE WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY

Petitioner Kevin Bond filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, alleging various claims arising out of his state court criminal trial.  (Doc. 1).  The Court referred this matter to Magistrate Judge Paul J. Komives for Report and Recommendation (R&R).  (Doc. 9).  Magistrate Judge Komives issued his R&R, recommending that the Court deny the petition and deny Bond a certificate of appealability.  (Doc. 13).  Petitioner objects to the R&R.  (Doc. 14).  For the reasons that follow, the Court **OVERRULES** Petitioner's objections, **ADOPTS** the R&R, and **DENIES** the writ and the certificate of appealability.

### I.   BACKGROUND

A jury convicted Petitioner Kevin Bond of first degree premeditated murder, MICH. COMP. LAWS § 750.316(1)(a), conspiracy to commit first-degree premeditated murder, MICH. COMP. LAWS § 750.316(1)(a) and 750.157a, four counts of assault with intent to commit murder, MICH. COMP. LAWS § 750.83, carrying a concealed weapon, MICH. COMP. LAWS § 750.227, felon in possession of a firearm, MICH. COMP. LAWS § 750.224f, and two counts

of possession of a firearm during the commission of a felony, MICH. COMP. LAWS §

750.227b.  The trial court sentenced him to two terms of mandatory life without possibility

of parole on the murder and conspiracy conviction, four terms of 22-50 years on the assault

convictions, two terms of 3-7 ½ years on the concealed weapon and felon in possession

conviction, and two terms of mandatory consecutive 2 years' imprisonment on the

possession of a firearm during commission of a felony conviction.

Through counsel, Bond appealed as of right to the Michigan Court of Appeals

raising three claims: (1) sufficiency of the evidence; (2) prosecutorial misconduct; and (3)

erroneous evidentiary rulings.  The court of appeals found Petitioner's claims meritless and

affirmed his conviction and sentence.  See, People v. Bond, No. 270091, 2007 WL

4208971 (Mich. Ct. App. Nov. 29, 2007) (per curiam).  Proceeding *pro se*, Bond sought

leave to appeal those three issues to the Michigan Supreme Court.  The Supreme Court

denied Petitioner's application for leave to appeal in a standard order. See, People v. Bond,

746 N.W.2d 69 (Mich. 2008).

In his *pro se* Petition for Writ of Habeas Corpus, Bond raises the same three issues

he raised on appeal in the state court, as well as the claims that he was denied effective

assistance of counsel and that the cumulative effects of trial errors denied him a fair trial.

(Doc. 1).  In assessing the merits, the Magistrate Judge relied on the facts as recited in the

prosecutor's brief in the Michigan Court of Appeals:

> Defendant was charged with 10 felonies, including the first-degree
> premeditated murder of Nicholas Green.  The charges against Defendant
> arose from Defendant's involvement in a July 19, 2004, driveby shooting on
> the north side of the City of Saginaw.  The shooting occurred in retaliation for
> the July 18th murder of Defendant's best friend, a young man from the
> east-side of the city.  Defendant's jury trial took place in October of 2005.
> Defendant was tried separately from Co-defendants Marcus Clemmons,

Tommy Keels, and Andre McKnight.  In October 2004, before trial, two witnesses— Dilanjan Miller and Trudell Feagin—were provided immunity in exchange for their testimony.

During Defendant's trial, the People presented 18 witnesses and introduced over 75 exhibits, including photographs of the crime scene and the vehicles involved, as well as other evidence collected at the scene.

On the first day of trial, the prosecutor and defense counsel noted that references to gangs or gang activity could come up as they had in a previous trial [for a co-defendant].  The prosecutor also noted that using the word gang or that type of terminology would be supported by the evidence, but that he would not exaggerate or draw that out.  The court recalled that references had been made in the other trial to the fact that the group of people in the van belonged to some east-side group and one of their members had been killed. He indicated that evidence would also be allowed in this trial.  The prosecutor then explained he didn't intend to use the [gang] terminology to excess, "but it could come up."  The judge responded by stating, "Tell your witnesses not to use it. Okay."

Also during trial, the court, over defense objection, allowed the prosecutor to introduce and play a videotape of witness Dilanjan Miller's September 22, 2004, statement to the police, pursuant to MRE 801(d)(1)(B) – a statement given prior to the grant of immunity.  And at the defense request, a transcribed copy of the video statement was also provided to jurors.

[the following facts were adduced at trial]

On July 18, 2004, Omar McKnight, a young man from Saginaw's eastside, was shot and killed. News of the McKnight murder spread quickly among his friends and family. The next day a group gathered at the home of McKnight's mother.  The grieving group included the Defendant, who considered Omar McKnight his best friend.

McKnight's friend, Tommy Keels, managed to obtain the use of a 1985 Chevy van on July 19th, the day after McKnight was murdered.  On that same date, a group of five young men, including Nicholas Green, were on Norman Street on Saginaw's north-side.  This group was working on a car that wouldn't start.  They had the hood of the car up and another car facing it as they were attaching jumper cables.

As it became dark on the 19th, McKnight's east-side friends (Defendant, Keels, McKnight's brother, Dilanjan Miller, Tradell Feagin, and Marcus Clemmen) began riding around in the van and smoking marijuana.

3

Several members of this east-side group, including Defendant, who had a gun in his lap, indicated they would ride around the north-side and start shooting if they saw someone – because they killed Omar.  Defendant's gun was small – like a ".22."  As they went down Norman Street on the north-side, they saw the group of men attempting to jump start a car.   Defendant exclaimed that Antoine Jones was in the group working on the car and the van driver, Feagin, turned the van around.  Defendant said, "we fixing to get 'em"…. "go get them n------".  Again, statements were made that Omar just got killed.  Dilanjan Miller was told to lay down out of the way.  As the van slowed to a quick stop, Miller saw Tommy Keels with a gun in his hand shooting towards the cars, while Defendant was shooting over him out the window toward the group of men by the cars. Defendant continued shooting out the back, at the group near the cars, as the van sped away from the scene.  Feagin, the driver, did not see whether Defendant, who was behind him, was shooting but did see Clemons seated next to him with a gun.

The group of young men working on the cars were caught in the barrage of gunfire from the van and panicked as numerous shots—"probably 30 to 40" in all—rang out at them.  Nicholas Green was hit by the shots and fell at the curb with blood gushing from his stomach.  Green was eventually transported to the hospital, but died from internal bleeding where the bullet penetrated his liver, lungs, and aorta.  The examining pathologist recovered the large-caliber bullet causing those injuries and turned it over to investigators.  Terrance Jones and Jamal Young, who were in the group by the cars, were also injured by the gunfire.

After the shooting, Miller was dropped off and told that he better not say anything.  The rest of the group rode in the shot-up van to an apartment house, where they parked the van and left it.

Raheem Nash, who grew up on the east-side of Saginaw, explained the animosity between groups or gangs on the east-side and north-side, as did a number of other witnesses.  Nash heard about the murder of Omar McKnight within an hour after it occurred.   He noted that "people were pissed" and that when Defendant was present, JR (Tommy Keels) stated, "somebody got to die, somebody got to go …"  Nash, who had been riding with the group in the van, but was dropped off before the shooting, observed two guns in the van—possessed by Marcus Clemmons and Tommy Keels. He thought one was a .40 caliber and one a 9 millimeter.

Police investigation at the crime scene revealed numerous casings around the two cars where the shooting occurred.  Analysis of the fired cartridge casings from the shooting scene revealed that there were several different types present: .40 caliber Smith & Wesson, .22 and a type characteristic of a .38, 9-millimeter or, 380 caliber class fired bullet.  The Chevy van used by Defendant and his companions was also inspected by the

4

police, who recovered a number of cartridge cases from inside the van. Damage and bullet holes in the van were consistent with shots being fired from inside the van.

A total of 35 fired-cartridge cases were recovered from the interior of the van and from the shooting scene (street area and cars). The fired casings from inside the van included .22 caliber casings near the rear, 9-millimeter casings near the middle, and .40 caliber Smith and Wesson casings near the from passenger seat. Firearms expert Ryan Larrison explained that laboratory analysis revealed all 12 of the fired .40 Smith & Wesson caliber cartridge cases from the shooting scene, and three from inside the van, were fired by the same Glock firearm. The .9 millimeter casings were also all identified as having been fired from the same 9-millimeter firearm. Similarly, the .22 casings were identified as having been fired from the same firearm. And the .380 automatic caliber cartridge cases were all identified as having been fired by the same firearm. Analysis of the various fired casings thus indicated four guns were used in the shooting—a 380 caliber, a 9-millimeter, a .40 caliber, and a .22 caliber.

(Doc. 13 4-8) (internal citations omitted).

After Bond filed a Supplemental Brief to the Michigan Court of Appeals, the

prosecution responded, and added the following additional facts:

Detective Paetz first encountered Defendant, in relation to a search warrant executed at Tommy Keel's apartment, the day after the shooting—Defendant was pointed out as someone who may know Keel's whereabouts, Defendant not in custody or under arrest at that time was rather uncooperative and [claimed] to have been with grandma all night;

Defendant testified at trial, as his counsel in his opening statement indicated he would;

Defendant's position at trial was that he was in the van from which shots were fired on the date in issue, but he did [not] shoot a gun, did not possess a gun at that time and did not engage in talk about going to shoot someone;

Defendant testified at trial that he wanted to cooperate with the detective and began talking to her again at the jail after his arrest, but then said he would only talk to her if his lawyer was present;

Defendant also admitted he was claiming alibi and had been with Darlene Traderon the date in issue;

[Detective] Paetz, in rebuttal to Defendant's testimony, explained that her second contact with Defendant was after he reported to probation, was arrested on a bench warrant and put in jail and Defendant signed a waiver of rights form indicating he was willing to talk, but when the detectives indicated they wanted to talk about the murder of Nicholas Green, Defendant stopped and said he did not want to talk and he became "quite belligerent."

(Id.)

The Magistrate Judge issued a R&R recommending that the Court deny Bond's petition and deny him a certificate of appealability.  (Doc. 13).  Bond's objections to that R&R are now before the Court.  (Doc. 14).

## II.   STANDARD OF REVIEW

### A.   Objections to a Magistrate Judge's Report and Recommendation

A district court must conduct a *de novo* review of the parts of a magistrate judge's report and recommendation to which a party objects.  28 U.S.C. § 636(b)(1).  The district "court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate" judge.  Id.  The requirement of *de novo* review "is a statutory recognition that Article III of the United States Constitution mandates that the judicial power of the United States be vested in judges with life tenure."  United States v. Shami, 754 F.2d 670, 672 (6th Cir. 1985).  Accordingly, Congress enacted 28 U.S.C. § 636(b)(1) to "insure[] that the district judge would be the final arbiter" of a matter referred to a magistrate. Flournoy v. Marshall, 842 F.2d 875, 878 (6th Cir. 1987).

The Sixth Circuit has stated that "[o]verly general objections do not satisfy the objection requirement."  Spencer v. Bouchard, 449 F.3d 721, 725 (6th Cir. 2006).  Only specific objections are entitled to *de novo* review; vague and conclusory objections amount to a complete failure to object as they are not sufficient to pinpoint those portions of the

R&R that are legitimately in contention.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir.1986) (per curiam).  "The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious."  Miller v. Currie, 50 F.3d 373, 380 (6th Cir. 1995).  "'[O]bjections disput[ing] the correctness of the magistrate's recommendation but fail[ing] to specify the findings ... believed [to be] in error' are too general."  Spencer, 449 F.3d at 725 (quoting Miller, 50 F.3d at 380).

### B.    Habeas Corpus

28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite of that reached by the Supreme Court on a question of law, or if the state court reaches a substantially different conclusion than the Court based upon a set of materially indistinguishable facts.  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

An "unreasonable application" of clearly established federal law occurs "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  A federal habeas court may not, however, find a state adjudication to be unreasonable

"simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, a habeas petitioner must demonstrate that the state court's application of clearly established federal law to the facts of his case was objectively unreasonable. Price v. Vincent, 538 U.S. 634, 641 (2003).

## III.   ANALYSIS

Petitioner argues that the Magistrate Judge erred in concluding that: (1) there was sufficient evidence to support his conviction; (2) the prosecutor's conduct did not deny him a fair trial, and (3) Petitioner failed to prove either prong of the ineffective assistance of counsel claim.  Additionally, Petitioner asks the Court for permission to "brief and argue" an "actual innocence" claim that was not included in his original petition. The Court reviews Petitioner's objections, then addresses his request to amend his petition.

### A.   Sufficiency of the Evidence

Petitioner argues there are two reasons why the evidence is insufficient to support his conviction: (1) the fact that he was in the van before and during the shooting does not support the jury's conclusion that he shot and killed Green and (2) both Miller's testimony at the preliminary examination and Feagin's trial testimony contradicted Miller's trial testimony implicating Petitioner in the crime. (Doc. 14 at 2-3).  Sufficient evidence supports a conviction if, after viewing the evidence (and the inferences to be drawn from it) in the light most favorable to the prosecution, a court can conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979); Apanovitch v. Houk, 466 F.3d 460, 488 (6th Cir.

8

2006); United States v. Jamieson, 427 F.3d 394, 402 (6th Cir. 2005). This standard of review does not permit a court to make its own subjective determination of guilt or innocence; the standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts. Herrera v. Collins, 506 U.S. 390, 401-02 (1993); McKenzie v. Smith, 326 F.3d 721, 727 (6th Cir. 2003).

The Court finds no violation of Petitioner's federal rights because the evidence presented at trial, considered in a light most favorable to the prosecution, clearly supports his convictions. Here, Petitioner asks the Court to resolve the conflicts in Miller's testimony and re-draw factual inferences from the circumstances of the shooting. The applicable standard of review prohibits the Court from weighing the evidence and revisiting the jury's credibility determinations. Martin v. Mitchell, 280 F.3d 594, 618 (6th Cir. 2002); see also, Jamieson, 427 F.3d at 402. The Magistrate Judge did not err in concluding that there was sufficient evidence to support Petitioner's conviction and sentence.

Petitioner questions why the Magistrate Judge did not review his "Supplement Brief and Material for Review" (Doc. 6) in connection with his insufficient evidence claim. (Doc. 14 at 2-3). Attached to that brief is an affidavit from Dwight Tyler, a newly discovered rebuttal witness who avers that Miller told Tyler he was going to give false testimony at Petitioner's trial. The Magistrate Judge most likely did not address Petitioner's argument because "[a]ttacks on witness credibility are simply challenges to the quality of the prosecution's evidence, and not to the sufficiency of the evidence." Malcum v. Burt, 276 F.Supp.2d 664, 686 (E.D. Mich. 2003) (citing Martin, 280 F.3d at 618). The mere existence of sufficient evidence to convict defeats Petitioner's claim. See, Gall v. Parker, 231 F.3d

265, 286 (6th Cir. 2000).  Moreover, even assuming Tyler was known and should have been called to testify to the matters identified in his affidavit at Petitioner's trial, the Court must presume that the jury would have resolved the conflict between his testimony and Miller's in favor of the prosecution.  See, Jackson, 443 U.S. at 326.  Therefore, even with Tyler's affidavit, there was sufficient evidence to support Petitioner's convictions under the Jackson standard and habeas relief is not warranted.

### B.    Prosecutorial Misconduct

Petitioner argues he was denied a fair trial because the prosecutor used of the term "rivalries," a witness used the word "gang," and the prosecutor referred to Petitioner's post-Miranda silence.  (Doc. 14 at 5).  Prosecutorial misconduct must be so egregious as to deny Petitioner a fundamentally fair trial before habeas corpus relief becomes available.  Donnelly v. DeChristoforo, 416 U.S. 637, 643-45 (1974); Hamblin v. Mitchell, 354 F.3d 482, 494 (6th Cir. 2003).  The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor."  Serra v. Mich. Dep't of Corr., 4 F.3d 1348, 1355 (6th Cir. 1993) (quotations omitted); accord, Smith v. Mitchell, 348 F.3d 177, 210 (6th Cir. 2003).  Petitioner's prosecutorial misconduct arguments are meritless.

First, the prosecutor never elicited from a witness the term "gang," nor used that word during trial.  "The record displays that during trial [a witness] did use the word gang, but the singular reference was nonresponsive to a question the prosecutor asked regarding whether territorial disputes existed in the city."  Bond, 2007 WL 4208971 at *4.  Given the nature of the case, the parties were bound to develop facts surrounding rival groups and territorial disputes.  To temper possible prejudice, the trial court barred the prosecutor from using the word "gang."  Id.  The trial judge did not prohibit the prosecutor from discussing

10

cross-town rivalries or other gang-related circumstances.  The Court cannot say the prosecutor's references to "rivalries" and other gang activity "so infected the trial with unfairness as to make the conviction a denial of due process."  Lundgren v. Mitchell, 440 F.3d 754, 778 (6th Cir. 2006) (quotations omitted).

Petitioner's second argument rests on a fundamental misunderstanding of Doyle v. Ohio, 426 U.S. 610 (1976).  In Doyle, the Supreme Court held that the Due Process Clause prohibits the prosecution from using a defendant's post-Miranda silence to impeach that defendant's exculpatory story told for the first time at trial.  Id. at 619.  However, if a defendant opens the door to government questioning by his own remarks about his post-arrest behavior, the prosecution may use a defendant's silence for the limited purpose of impeaching his testimony about what he did after his arrest.  Id. at n. 11.  As explained by the Sixth Circuit, "Doyle expressly recognizes that a prosecutor's reference to a defendant's post-Miranda silence may properly be made where it is not used to impeach the defendant's exculpatory story, or as substantive evidence of guilt, but rather to respond to some contention of the defendant concerning his post-arrest behavior."  Smith v. Jones, 326 Fed.Appx. 324, 330 (6th Cir. 2009) (quoting U.S. v. Martinez-Larraga, 517 F.3d 258, 268 (5th Cir. 2008); see also, United States v. Allston, 613 F.2d 609, 611 (5th Cir. 1980); United States v. Shue, 766 F.2d 1122, 1129 (7th Cir. 1985).

Here, Petitioner testified that he turned himself in and talked with the police when he heard from his grandmother that the police wanted to speak with him.  (Doc. 10-9 Trial Transcript IV at 111-121).  He opened the door to the prosecution's calling of a police witness to rebut this inference of cooperation.  The prosecutor elicited from Detective Paetz the circumstances surrounding Petitioner's arrest, including his post-Miranda silence, to

contradict his version of post-arrest events, not to exploit his silence as probative of guilt or impeach his exculpatory story.  (Id. at 124-29).  The use of Petitioner's silence under these circumstances falls within the Doyle exception.  Furthermore, the prosecutor's comments on this matter during closing arguments were also permissible.  Petitioner is not entitled to habeas relief on his prosecutorial misconduct claim.

### C.    Ineffective Assistance of Counsel

Petitioner argues trial counsel was ineffective because he did not object to the prosecutor's use of his post-Miranda silence.  (Doc. 14 at 9).  To establish ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable.  Strickland v. Washington, 466 U.S. 668, 687 (1984); Bigelow v. Williams, 367 F.3d 562, 570 (6th Cir. 2004).  Like above, Petitioner's objection is premised on a misunderstanding of the Doyle exception.  Counsel's failure to advance a meritless objection is not constitutionally deficient performance.  See, Bradley v. Birkett, 192 Fed.Appx. 468, 475 (6th Cir. 2006).  Because Petitioner failed to establish that the prosecution committed Doyle error, he cannot show "a reasonable probability" that but for his counsel's lack of objection, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694; see also, Smith, 326 Fed.Appx at 329-330.

### D.    Request to Amend Petition

On page four of his objections, Petitioner asks the Court for leave to amend his petition to add a new claim of "actual innocence."  (Doc. 14 at 4).  A habeas petition may be amended "as provided in the rules of procedure applicable to civil actions."  28 U.S.C. § 2242.  Fed.R.Civ.P. 15(a) (2) allows a party to amend its original pleading on leave of

court, which the court "should freely give ... when justice so requires." Petitioner never filed a proper motion to amend and provides no explanation for this late request. The Court denies Petitioner's request to amend on the grounds of undue delay. Moreover, because Petitioner failed to present this issue to the Magistrate Judge, Petitioner is procedurally barred from raising it in his objections to the R&R. See, Murr v. United States, 200 F.3d 895, 902 (6th Cir.2000) (citing approvingly several courts which have held that, absent compelling reasons, "the Magistrate Judge Act ... does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate."); see also, United States v. Waters, 158 F.3d 933, 936 (6th Cir. 1998) ("[I]ssues raised for the first time in objections to magistrate judge's report and recommendation are deemed waived.").

### E.    Certificate of Appealability

Petitioner furthers only a general objection to the Magistrate Judge's recommendation concerning his certificate of appealability: "if this Court should reject Petitioner's objection, a certificate of appealability should issue regarding the above claims." (Doc. 14 at 10). The Magistrate Judge fully addressed the certificate of appealability issues. (Doc. 13 at 24). Petitioner's general objection does not meet the applicable standard. See, Spencer, 449 F.3d at 725 ; Miller, 50 F.3d at 380. Accordingly, Petitioner's objection is overruled and the Court adopts the Magistrate Judge's analysis as its own.

## IV.    CONCLUSION

13

For the reasons stated above, the Court **OVERRULES** Petitioner's objections (Doc. 14), **ADOPTS** the Report & Recommendation in its entirety (Doc. 13), **DENIES** the Petition for Writ of Habeas Corpus (Doc. 1).

Because this decision is adverse to Petitioner, the Court is obliged under Rule 11 of the Rules Governing Section 2254 Proceedings to "issue or deny a certificate of appealability." Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability ("COA") is issued under 28 U.S.C. § 2253. A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (citation omitted).

For the reasons stated in the R&R, the Court concludes that reasonable jurists would not debate its conclusion that the petition does not present any claims upon which habeas relief may be granted. Therefore, the Court **DENIES** Petitioner a certificate of appealability.

**IT IS SO ORDERED.**

s/Marianne O. Battani

MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

**DATED:** March 23, 2011

**CERTIFICATE OF SERVICE**

Copies of this Order were served upon Petitioner and counsel of record on this date by ordinary mail and/or electronic filing.

s/Bernadette M. Thebolt
CASE MANAGER
